Good morning, ladies and gentlemen. Good to see all of you. The first case on today's oral argument calendar is Doe v. Trump. You may proceed. May it please the Court, I'm August Flegge with the Justice Department. With me at Council tables are Courtney Moran and Brian Ward. I will try and reserve four minutes for rebuttal. We are asking this Court to stay the District Court's legally flawed and vastly overbroad universal injunction of the President's recent proclamation addressing the harms caused by new arrivals who do not have a plan for addressing their health care needs upon entry to the United States. The President's health care proclamation is a valid exercise of the broad authority Congress gave the President in Section 212F of the INA, and the District Court's reasoning and its injunction cannot be squared with the recent Supreme Court decision in Hawaii, as Judge Bress explained in his opinion on the administrative stay. The Supreme Court there explained that Section 212F is a comprehensive delegation to the President to impose additional limitations on entry beyond those grounds of exclusion set forth in the INA, and that's a quote from the opinion. In other words, in addition to inadmissibility grounds, such as the public charge ground of inadmissibility, with respect to the legal authority to issue this proclamation, there's no basis to distinguish Hawaii. Indeed, there were no dissents from the portion of that opinion talking about the breadth and scope of Section 212F. I'm sorry, I have a cold, so I'll do the best I can. Is it the government's position that the, first of all, that the President can exclude any group For example, could the President exclude all children on the theory that they, well, on no theory, first of all, i.e., does he have to have a reason, or B, on the basis that it's against the, the reason it's against the interests of the United States is because they use up educational resources? The, 212F, and I don't know the answer to that because I don't, I haven't studied the provisions of the INA addressing children, but Well, you should, and there aren't particularly any. There's certainly nothing that addresses whether, I mean, we know constitutionally that they have to be allowed to go to school, but there's nothing specific that says whether children as children can come in or not. I mean, there are some provisions that have special provisions for children. Yeah. Well, I'm saying the TVPRA sets up a very specialized scheme for unaccompanied children, and I have not studied that and whether and how that works with Section 212F, so I, I don't want to directly answer that. I do want to say if the President, and this is the language of the statute, whenever the President finds the entry of any class of aliens would be detrimental to the interests of the United States, he can suspend or put restrictions on entry. Well, yes, but And that is a common I mean, if you looked at the list of when this has ever happened, it's always had something specific to do with foreign relations in the sense that we usually use the term foreign relations. Now, I understand that you're saying that anything having to do with immigration is foreign relations, but it's usually, it's always been foreign relations or national security in some identifiable sense, and the interests of the United States, given the history of this provision, can certainly be understood in that fashion. Well, I would push back on that a little bit. In SAIL, it was about a blockade in the high seas, and the court, the proclamation talks about the burdens of people arriving by the high seas would place on the immigration system. That is a domestic harm that the President identified. Yes, but they were on the high seas. I understand that, but the point is that the rationale for that That's foreign relations, piracy and all that. Entry into the United States is the same thing. I'd also note at Buresk, which the Supreme Court favorably cited in Hawaii, talks about injuries inside the United States, and the court, the D.C. Circuit there said, well, this ground of admissibility might not apply, but the President is not powerless. He can add a restriction on entry that would address this harm in the United States. And Hawaii itself, you know, we can talk about it's a national security, but the ultimate harm addressed there is harm inside the United States if there was inadequate screening. So and the statute itself speaks of harms to the interests of the United States, which, you know, could be foreign relations harms, but would often Also, is this a one-way ratchet? Can the President exclude whoever he wants, but can't let in whoever he wants? Well, that is really the way the INA was set up. Congress set up a number of specific inadmissibility grounds, and then it said the President also can add them. You have discretion, and in the terms of the Supreme Court, the statute exudes deference to the President and entrusts to the President the decision-making on which additional ground, which additional reasons to preclude entry. And that is a scheme that Hawaii approved. And it makes sense because Congress and the President share constitutional responsibility over the border, over the entry of aliens. And that comes from NAWF, which where the Supreme Court, you know, in a non-delegation challenge back in 1950 said, no, the non-delegation doctrine does not apply here, because the President and Congress share authority. This precursor to Section 1185. But again, that was specifically in the context of a national emergency. Yes, because the statute at that time said it was applied when there's a national emergency. And Hawaii talked about that change in the statute and said, one reason you can't limit 212F to national emergencies or war or things like that is because Congress removed that language and understood that the President would have essentially coextensive authority to define when there's a class of aliens will cause a detriment to the United States and should be, and entry should be precluded. I understand the government's position that we should not look past the findings or examine the findings, but is there any support in the administrative record for the statement in the proclamation that immigrants are three times more likely not to have health insurance than citizens? Well, I do want to talk about the justification. Hawaii said it's, quote, questionable whether a court could review it, but if you take a look. I'm sorry. My question was, is there any support in the administrative record for that statement? Okay, I'm sorry. I should have been more direct. The administrative record that we submitted to the court relates to the implementation of the proclamation. There is not an administrative record for the proclamation. It is a presidential proclamation. So there's no support in the administrative record you submitted. Is there support anywhere else you can cite to? In plaintiff's coup declaration, they cite statistics that show, similar to what the President found, that a much higher percentage of new arrivals lack health insurance than. . . I'm looking for the statement that three times as many. It's made in the proclamation. There's no citation to it, and if there isn't a citation to it, that's fine. We can then talk to them about the next step. But is there any support in the record? The proclamation stands on its own as the President's determination, and I do want to stress that the plaintiffs have not disputed that aspect of it. They have said it's not as big a problem because there's a small number of new arrivals, but they have not disputed that. . . And because immigrants use less medical care. Yes, and because they use. . . Because they don't have health insurance. The net result being that all immigrants, not just legal immigrants, as I understand it. . . Their coup declaration is very general. It's not talking about the same groups, and they mention that in their. . . Right, but he says that even if you look at all immigrants, the percentage of uncompensated care or of care, uninsured care that they're using is something like 0.6 percent or something like that, or 0.06 percent, something minuscule. Well, new immigrants are a small portion of the total population of the United States. Exactly. So that's not surprising, but. . . So it's therefore not surprising that this problem, which is a big national problem, although the thrust of the current administration is to have more uninsured people, not fewer, this particular group is being singled out. And this is one thing I want to ask. Despite the fact that Congress has specifically provided for covering them in a subsidized fashion under the ACA, right? Doesn't the ACA specifically provide for legal immigrants to have subsidized care, yet the subsidized care does not count for this purpose? The ACA does permit LPRs to obtain subsidies, cost-sharing subsidies, on the individual market. But the problem is. . . And so why isn't that a direct contradiction with Congress, leaving aside the INA itself, which we can get to? Well, there are a few reasons. First, I want to stress, plaintiffs did not argue this in their PI motion. They argued that it violates the public charge. No, they did. The district court did not rule on it, but they argued it. Well, I question that. If you look at their PI motion from page 13 to 20, they talk about the provisions they think it violates, and they don't talk about the ACA. But in any event, the district court didn't rule on it, so we're sort of pretty far away from the record here. Yeah, we can affirm on any basis, at least according to DACA and the other cases, that we don't necessarily have to. . . We're not confined by the district court opinion. Well, we're asking for a stay, so we think you should look at the grounds the district court ruled on to issue the injunction. But there's no conflict with the ACA, and I want to stress that. There is just no conflict. First, the ACA says nothing about entry. It talks about plans that are available once a person is here, and it does not say nothing about 212F, which gives the President this authority to make restrictions on entry. Second, there's nothing about the proclamation that limits an alien once they arrive. An alien can get a plan that satisfies the proclamation, come to the United States, and then under the ACA get a subsidized ACA plan. There's nothing preventing that. And in that situation, what has happened? What's happened? We have a new immigrant who has insurance, and that is the problem the President was tackling. Three times as many new arrivals lack any insurance. And if the alien makes a plan and maybe talks to advocacy organizations, how can I negotiate this, navigate this new requirement, what it does is, at the end of the day, it's more likely that the alien will have health insurance, which is what the President is trying to tackle. And I want to stress, this is the increase we started. We got off of the subject. So what they're supposed to do is pay for the coverage that doesn't really provide much coverage and then pay for the subsidized coverage, too. Well, again, the President is tackling the problem of aliens who have no insurance. So if an alien buys — Yes, but then why is he accepting subsidized ACA insurance, when they have the right to have that and when they wouldn't be uninsured and when they'd be better insured than what it is that he's making them buy? Well, again, part of the justification is that the aliens plan on their — with their own resources to take care of their health care needs. So at the moment of entry, when they're planning to come, they have to have a plan using their own resources to be responsible. All right, let's suppose we thought that's totally irrational. Because the day they arrive, they can get a plan, which is subsidized, you're telling me, because they have a right to get that. And yet you're making them buy something that they don't need. I want to know. I have a question. Suppose I came to that conclusion. You're telling me that that doesn't make any difference and I nonetheless have to approve this. We think that — Hawaii said it's questionable whether you can even connect the dots with a presidential proclamation. The president is entitled to make these judgments, and it is the president's job that Congress gave him to make these types of judgments. But even if you get beyond that and say, well, we're going to take a peek, it's not disputed that we have a much higher rate, three times as many in the proclamation, people who are uninsured. And keep in mind, three times as many who are uninsured under a current environment where subsidized ACA plans are available. So that's not enough. That is not enough to bridge the gap. They're available now, yet three times as many new arrivals lack insurance. So you say. So the president says. So the president says. And so plaintiffs don't dispute that. All right. They really don't. May I ask you a practical question? This is geared toward reasonably foreseeable medical costs. Yes. And in looking at the implementation of that, how are the agencies assessing what is a reasonably foreseeable medical cost? For example, let's assume Arnold Schwarzenegger comes for entry, presents himself. He has no foreseeable medical cost. Is there an ability for him or somebody like him to enter without insurance? It doesn't seem to be under the regulations, but maybe you can correct me. Yes. Again, there's two ways to satisfy the proclamation. One is to purchase one of the many, the wide range of insurance products that are available. The second is to show that you have the ability to pay for reasonably foreseeable. No, no, not pay. Again, this application of the proclamation kind of got enjoined before it even started, but State Department had issued guidance that said, evaluate the current medical condition based on the health forms, which are already submitted. Right. I've read through all that in the administrative record, and I don't see anywhere except maybe the IR-5s where there's an assessment of reasonably foreseeable medical costs independent of the insurance requirement or financial requirement. In other words, if you're perfectly healthy and you don't have insurance and you don't have financial means, under the proclamation as implemented, you don't seem to be able to get into the United States. Is that right? I'm not sure that's correct because I think one of the guidance documents said if someone's healthy and does not show a sign of having foreseeable medical costs and has the other paperwork. That dealt with a certain subclass, as I understand it. That dealt with a subgroup of people, but not in general. That was only one class as I read the administrative record. It dealt with the IR-5 people and nobody else. IR-5, yeah. Oh, do you mean the? IR-5s. IR-5, yeah. I've had you reel to the 5s. These are the parents of U.S. citizens. I can try and find that slide before the rebuttal and talk about it, but the guidance that went out on the FAM was that if the person's healthy and has an affidavit of support, which is required for the public charge grounds, which shows that they're going to. Affidavit of support. See, now you're adding to my hypothetic. If they're healthy and they don't have an affidavit of support, they don't have insurance, they still can't be admitted, even though they have no foreseeable medical costs. I'm not sure that's correct, but, again, that application might require. I mean, it might be the consular officer making a judgment call, depending on resources balanced against reasonably foreseeable medical costs. Before you sit down, I might really like you to address the overlap with the public charge provision and the recent sitting county of San Francisco case. I mean, it is striking that, in that case, the DHS went through notice and comment rulemaking and had an administrative record, and we were able to review the whole expansion or interpretation on an administrative record. And then this thing comes kind of out of left field, addressing at least a big chunk of the same set of problems, and we're supposed to completely just say, oh, fine, without any record, any notice in common, and any substantive review. That's basically where we are. Well, the President does not issue proclamations after notice and comment. I understand, but I want to know about the overlap. I mean, why isn't it the case that when the public charge thing specifically relates in part to health and finance, right, and the new regulation deals with health insurance and financial ability, and this deals with health insurance and financial ability, but nonetheless this is regarded as something to the side of what's already in the statute, which has a multiple-factor approach to public cause, and it would appear that if this were valid, the President could simply, with regard to every one of the factors in the public charge, come forward. For example, he could say nobody without a college education could come. I gather he could say that, even though education is one of the public charge issues. I mean, 212F exudes deference to the President and entrusts him to make determinations. I want to know, is there any limit? Well, let me answer how this is different from public charge first, because if we put aside the part of Hawaii that says the President can supplement existing grounds of inadmissibility, which is what happened here, this targets a different problem and has a different solution than public charge. The problem is different. This is focused on the burdens of uncompensated care for new arrivals, whereas I keep saying over and over again new arrivals lack insurance at much higher rates. That burdens private hospitals. That burdens emergency rooms because people seek non-emergency care. Well, but the plaintiffs maintain that on the insurance that they're required to pay, they're going to burden them more. I think, well, if you look at the health care professional declarations that the plaintiffs submitted, and there are a lot of them, they all talk about how the insurance products that are available, and they admit that these products are available, such as visitor's insurance, are not as good as the ACA. No, but they don't cover maternity, and they don't cover outpatient prescription at all, most of them. None of them cover maternity, and they don't cover and then they have huge deductibles such that the end caps, such that they are as compared, for example, to the subsidized ACA care, but even in general are not directed at privately provided free care. If I can. Go ahead. They're different. They're less comprehensive than the ACA. But what the President was addressing were aliens who get no insurance. They're more comprehensive than having no insurance. So if there's a $5,000 cap on surgical coverage, which you see in the Palin-Cordell declaration, that's $5,000 that's covered for someone who has visitor's insurance, where that $5,000 would burden the hospitals, it would burden people, the public who has costs shifted to them, and if they seek that care in an emergency room when they didn't need to. All of that is what the President is addressing here, the comparison between someone who comes in with no insurance, three times as often as someone, a U.S. citizen, and burdens the health care system more than if they got one of these range of plans. And this is a flexible range of plans. That's the irony of Jane Doe No. 2 is pregnant, and none of these plans cover her pregnancy. Well, Jane Doe No. 2 is a U.S. citizen, so she's sponsoring her parents to come. And if you look at the – that gets to the harm part. Plaintiff's declarations are entirely conclusory about the harm, and it's hard to see it as anything other than self-imposed. Everyone says, well, the insurance is unaffordable, but they don't tell us how much it costs or what kind of resources they have or what kind of plans they looked at. Some say they can't get visitor's insurance plans, but plaintiff's health care experts say that they can get visitor's insurance plans. One plaintiff, Jane Doe No. 3, says her husband purchases travel insurance when he comes to the United States normally, but now that's not possible. It's just their declarations addressing harm are entirely conclusory and don't justify injunctive relief, which is what – We'll ask them about that. Certainly not a national injunction. Your time is up, though. We'll give you rebuttal time after Judge Persons questions. Okay, I have one more question. With regard to the – what seems to me to be a massive overlap with the public charge, let's say there is a small part of this that is being paid by private – provided privately, but a huge chunk of what it is that uninsured people are using are public hospitals and state and local means of paying for medical care. So there's still a huge overlap, and the question is, is your suggestion that that overlap, the fact that most of this at least is within what's covered by the public charge provision makes no difference at all? He can simply pull out something which is within the public charge rubric and nonetheless have a completely different rule. We have two arguments. Hawaii said quite clearly the President can supplement existing grounds of inadmissibility. So that's what happened here. This is a supplement to the public charge rule. And the second point is this targets a different problem in a more focused way. The problem is different because it's about aliens lacking health insurance and the cost those impose on the public, yes, but also on private parties, emergency rooms, hospitals. That is the component of the problem that is different, and the solution is different. The solution is not – if you don't meet public charge, you are inadmissible. You're out of luck. Here there's a range of health insurance products at a range of prices that satisfy the proclamation, and plaintiffs have not shown that that is not available. There are markets that have developed already for visitors' plans to address this proclamation. They are out there and available and readily available. And if this proclamation gets intending immigrants to think about their insurance plans when they come to the United States where insurance is the norm and it decreases that 30 percent, it's accomplished its purpose. And the President – again, the agencies are going to submit reports every 180 days, I believe, to evaluate if it's working, and that's exactly what the President is hoping to achieve here. And it's a reasonable way to address a problem. The government not only hasn't put any evidence in at all to contest the declarations that were put in by the plaintiffs, including that this is going to affect 60 or 65 percent of legal immigrants. You're not contesting that. You have no counter evidence. Do we just take that as a fact, established fact? Why not? I mean, I can't recall if we submitted statistics. Nothing, nothing. Okay. I mean, it does – it applies to intending immigrants in multiple categories, and I think spouses and parents are ones that it will apply to more often. Okay. But we have several declarations saying we're talking to 60 to 65 percent of the legal immigrants. Do we take that as a fact? I think the OMB notice estimated that these questions would be asked of 300,000 or 400,000 people. Not the questions. I'm not talking about the questions. Well, the questions to satisfy the proclamation. Yes, but their record is that the result is going to be that 60 to 65 percent of the otherwise eligible legal immigrants are going to be kept out. Well, no, that's not a fair assessment of this proclamation. But that's the record because you haven't put anything else in. Again, I think it's – they have to do something more than say there's a number that everyone who's affected is not going to satisfy. They don't do that. They have experts who tell you how they get the number, and that's what we've got. Again, we have a legal issue here on whether this is authorized under the INA. If you want to talk about harm, it cuts both ways because if there are a couple hundred thousand or whatever number there is that have to satisfy the proclamation, aliens who are likely to – not likely, but much more likely to not have insurance than people in the United States already. And so the President is addressing a real problem. And in joining, as the district court did, the President's efforts to address that problem not only is a significant institutional harm because Congress entrusted the President to make these judgments. That is the person who is charged in our country with making those judgments. And so if it impacts that number of people, then there's a real problem. And we have shown that you can satisfy this proclamation with a range of insurance products. And, again, you know, if I go back to the current situation, subsidized ACA care is available now, but the problem still persists. Thank you, Counsel. Thanks. Good morning.  I'm Naomi Iger with Sidley Austin for Plaintiffs Appellees. I also have at counsel's table with me Nadia Dahab for Innovation Law Labs, Jessie Bless for the American Immigration Lawyers Association, and Esther Sung from the Justice Action Center. I'm sharing my time today with Ms. Sung. My plan is to address the first of the stay factors appellants showing on the merits. Ms. Sung will address the remaining stay factors and also the scope of the injunction. Okay. On the merits, appellants cannot make the strong showing required for a stay. Hawaii tells us that the President cannot use Section 212F to override statutory provisions. Here the proclamation overrides. It doesn't even quite say that, right? It says essentially we're going to assume that. And it looks for whether there's an implicit bar, were there any provisions that implicitly bar the President's actions. Here the proclamation. But it also gives, underscores the President's authority under the statute and in rather sweeping terms. So how do you deal with that? So it does that, and then it goes on. So it acknowledges that the text itself is broad, and then it continues, and it says we're still going to check the findings, we're still going to check for whether it overrides any other provisions of the INA, we're going to look whether Congress has already legislated in the relevant sphere. Those are the three parts of the analysis. I think it's Roman III of the decision. And so we're urging the court to do the same thing, not to accept that because it is broad on its face it is limitless, but instead that we read it within context and we find its limits, both by the requirement of the findings, but also whether it conflicts or overrides another statute or to use other language from the decision, whether there are other statutory provisions that implicitly bar the President's actions. And Judge Berzon has identified some of those issues that we've already discussed with the problems with the INA, the ACA and other health care laws, and also VAWA. Also which? I'm sorry, what's the last one? Violence against women. I do want to address just a few things that appellants have said today that may need a little revisiting. So I heard today appellants say that the proclamation says that immigrants are three times more likely that, sorry, he said that there are new arrivals. You need to stick closer to the microphone, otherwise we can't. Oh, my apologies. Yes, thank you. I heard appellants say that new arrivals are three times more likely to lack insurance. I believe what the proclamation refers to are immigrants. The proclamation doesn't discuss the new arrivals that are the target of the proclamation. I think it says legal immigrants, does it not? Yes, thank you. Lawful immigrants. But that is different. Yes, it is different. And appellants also said that the problem it's addressing is immigrants who don't have insurance in the United States. The class of aliens that it bars includes those aliens who would have comprehensive insurance with subsidies. So the finding about the lack of insurance for lawful immigrants doesn't pertain to the class of aliens who are barred, which includes people who would have insurance with subsidies. So what is the scope of our allowable review of findings in a presidential proclamation? The government says we cannot look at those findings. We have to accept them. It's not like a normal APA review. And there's some support for that in Hawaii. What's your response? So Hawaii doesn't specifically state the standard of review for the findings, but what it does say is different than what appellants have said. Appellants have said the president doesn't need to connect the dots. And I'll read you from Hawaii the context from which that comes. It says that when the president adopts a preventive measure in the context of international affairs and national security, he is not required to conclusively link all the pieces in the puzzle. So in that context, where we have national security, and in the context of Trump we had very detailed findings from intergovernmental review that were specific to the countries that were at issue in that proclamation, there where you have these very detailed findings and you have national security, we can see that the court was willing to be deferential. Hawaii also refers to some other proclamations in the foreign affairs context where there were more superficial findings. So maybe we know that, okay, if we're in foreign affairs, more superficial findings might be okay. But here we're in a really different place. We have essentially no findings about the class of aliens actually being barred, and we're in a domestic sphere where Congress has already actively legislated. How do you propose to police this line between foreign and domestic? Because 1182-F, just by its nature, is about the entry of persons into this country. It's always going to have some amount of domestic valence to it, but yet it also clearly has a foreign affairs valence to it too. Well, I would pause and say I don't think it always has a foreign affairs context, and I think Hawaii also helps us answer this question because Hawaii looks at the text of the proclamation in that case to understand the motivation for it. It says we look to the text, and there on the face of the proclamation there was a connection to some foreign affairs component. So if we do the same thing here and we look at the text of the proclamation in this case, we don't find that connection. So I think that's the first way we do it. I'm not sure that's right. The proclamation talks about how this will be implemented, which is by interviews conducted by consular officers who are obviously operating outside the United States. That seems like a pretty obvious foreign affairs connection there. So if that's a foreign affairs connection, it's something far more daisy-changed to what's happening here than anything we've seen in any other exercise of Section 212-F. So if you want to see it as a weighting, if you want to see it as a spectrum, rather than is there a foreign affairs connection or is there not, we're way on the side of where we're just inferring this sort of foreign relations connection that's not apparent on the face of the proclamation. And I think if you look at all the other cases the government has cited here, you'll see that the connection between foreign relations is much more clear. And I would say also that this idea of foreign relations power in the immigration laws is already an exception to the general rule that the president doesn't have lawmaking authority. And so to take this foreign affairs exception and make it apply to every law that in any way touches any immigrant is to allow the exception to swallow the rule. I did have a question about this looking at your opposition brief. Most of the district court, or at least the central part of the district court's analysis, was under the non-delegation doctrine. So are you defending that aspect of the district court's holding, or are you abandoning it? I wasn't sure from your brief. So I disagree with the characterization for the first point. I think he discusses the non-delegation doctrine and the holding of separation of powers. And if you look at what the injunction does, the injunction enjoys the proclamation, So do you think this was a violation of the non-delegation doctrine? So what I think is if you're willing to read 212F with the kind of limitations that emerge when you place it in its statutory context, 212F as it relates to 212A4, for example, 212F as it relates to a comprehensive scheme on health care, the ACA, if you're willing to read those limits into what 212F means, because as of Hawaii, 212F can't override other statutes, that is one approach. And in a way, that's the approach that the majority took in Gundy. We look to things other than the literal words on the page in a vacuum. The way we get to the non-delegation problem is if you take appellant's approach, they're not able to find any limiting principle at all. I'm not saying the Court has to do that. I'm saying if that is the answer to why this proclamation can stand, we have a new problem that raises grave constitutional concerns. So you didn't plead non-delegation, correct? We argued it in our brief as constitutional avoidance, but as a response to their position. As I read the district court order and try to match it with your complaint, where does it fit in? Because it didn't seem to match your pleadings. So I'm not sure in what sense you mean. So the two primary bases of the district court opinion, non-delegation and separation of powers. And you didn't plead those specifically as far as I can tell. You pled APA. You pled ultra-virus. Maybe that fits into that. Yeah, so that's correct, yeah. In our description of ultra-virus, we said that separation of powers, that if Section 212-F could be used this way, it would be a separation of powers problem. So I will double – I don't have it at my finger checks. I will double-check that for you to confirm. But the way we understand 212-F is the way Hawaii does, which is you check to see if it's overriding Congress. And if it's overriding Congress, that's where you get your separation of powers claim. You can avoid that by reading in some limitations. But if you don't read in those limitations, then you have a non-delegation problem. But with regard to overriding Congress, the real question, it seems to me, is how close in does it have to be? That is, or to put it in ordinary preemption terms, is this kind of a field preemption sort of point? That is, the public charge provision and perhaps others are what Congress meant to do about anything having to do with health or finance, and you can't add to that. Or does, as I understand, the government's more forgiving position, aside from its position that we can't do anything, that it doesn't matter if there's a connection, is at least there's nothing explicit in the statute that says you can't – that this kind of a provision is no good. Well, let me take that on a couple of steps. We know what the difference may be between field and conflict preemption. Unless you're saying this really is more like conflict preemption. I'll take that in a couple of ways, starting with Hawaii, where it refers to express override, and then it also looks whether there's an implicit bar. So you could use that language. And it also checks to see whether Congress has already acted in the relevant sphere. And I think that's where you're thinking preemption because we're talking about spheres. Well, I'm not calling it preemption. I'm just looking at the concepts. And it is a similar concept in the sense that the purpose of all of this is the same. It's to check to see whether Congress has already legislated in this space and whether the president overrides what Congress has done. Now, I think that appellants would say in the foreign relations context he might have some authority to maybe run into Congress in some way, but we're not there. And I think Youngstown talks about implied will of Congress. So you can use – you can draw from these different cases to find that we do look for what is both explicit and implicit in Congress's legislation when it has already legislated in this space. So the public charge provision has basically five different features to it. If the president issues a proclamation that relates to any one of those, would that then be unlawful under your reading of this scheme? So that isn't our case. Well, I think it is your case, right? I mean, we could take any one of these features, age, health, family status, financial situation, or education-slash-skills, which is the last one, and if the president were to issue an executive order that relates in any way to any of those factors, wouldn't you be arguing that that's an override of the multi-factor test in the public charge provision? We don't think this proclamation relates in any way to any of those. What we think is that it is a new, single-factor dispositive test that overrides the multi-factor test. It has to relate, right? I thought that your whole point was that it's so closely related that it's actually essentially preemptive of the executive order. So I think your question to me is, is anything related to public charge automatically a violation? That is my question. I am having trouble imagining what related means in this context, so I'm taking it back to our facts where we have single-factor dispositive test. Right, but isn't that just a supplement to the public charge? Because the single-factor test... Contrary to what you said, the public charge provisions still remain, the multi-factor test, and under the government's theory, this just adds to it. What's wrong with that? It's a test for who will so financially burden the United States that they should be barred, and so it's a financial burden test with one factor, which is health care insurance. It's also a conventional bar. But also, as I understand the government's argument, there's not 100% overlap because, even on your approach, because the proclamation includes impact on private entities, not just on the public. So I don't think the question is about overlap but override. So, for example, in this multi-factor totality of the circumstances test, a person may satisfy Congress's concerns about financial burden, and yet the health care test that the President has issued will override that instead of being considered within the multi-factor test that already takes into account health and finances. So that's the nature of the override. I want to pause just because I'm conscious of time and I want to respect my colleague, Ms. Song, her time. I'll respond to questions, but I'm also happy to come back up after she gets a chance. Thank you, Kels. Good morning, Your Honors, and may it please the Court. I'm Esther Song with the Justice Action Center for the Plaintiffs Appellees. And I will address harms first. A stay is not warranted here because the government has not made the necessary showing of irreparable harm. As Judge Berzlin pointed out, there's simply no evidence in the record of the harms that the government is describing in its briefing. There's no evidence substantiating these harms. There is this figure of immigrants being three times more likely to be uninsured, and there's this $35 billion figure of annual uncompensated care costs. But there's nothing in the proclamation, and there's certainly nothing that the government has submitted to explain or quantify what share of that $35 billion of uncompensated care costs is directly attributable to uninsured immigrants. So I repeat my question. What's the scope of our review of findings of fact in a presidential proclamation? The government says basically in a presidential proclamation we don't have any authority to look behind the proclamation, unlike the Administrative Procedures Act. So what's the scope of our review? What's your best case for that? I think, as my colleague, Ms. Igra, said, we can look to what Hawaii tells us. And in Hawaii, what we had was a national security context and very detailed findings. Here, we don't have a national security context, and we don't have very detailed findings at all. But in any event, you're talking about irreparable harm. And don't they have an obligation to get a stay to show irreparable harm? There's a difference, isn't there, between substantive review and what they have to demonstrate to get a stay, which is essentially an injunction? Don't they have the same obligation as any litigant to come forward with information showing what their harm is? I mean, with data, actual record data? Yes, Judge Burson, that's absolutely correct. And we don't think that they've made that showing here. Well, let's assume for the sake of argument that the proclamation, the factual allegations are true. Does that change your argument? No, I don't think it does because the uncontroverted record evidence that we've submitted shows that, well, first of all, even if the findings are true, they don't actually provide the necessary evidence to show the harm that the government is describing in its briefing. And second, the uncontroverted record evidence shows that to the extent that there is an impact by arriving immigrants who would enter at this stage of the litigation between now and when this court can consider the merits of the government's appeal, which is a relatively short period of time, the impact that uninsured immigrants would have is exceedingly small. The coup declaration says, as Judge Burson pointed out, that uninsured immigrants consume less than one-tenth of one percent of American medical resources and emergency services. Which is not necessarily legal immigrants either. It's all immigrants. That is correct. That is correct. And moreover, according to the government, once these people come, they can go on to the ACA subsidized provision. So their interest is limited by that concession because they're agreeing that that is not essentially not part of the interest that's being forwarded. Yes, we think that's absolutely correct. Isn't there something somewhat troubling, though, about relying on the coup declaration as opposed to a finding that's in a presidential proclamation? First of all, the government hasn't tried to contest the evidence and the figures in the coup declaration. And the finding in the proclamation still does not speak to the harm that the proclamation is ostensibly trying to address, which is the contribution that uninsured immigrants make to uncompensated care costs. And although the proclamation does identify the $35 billion, that's uninsured uncompensated care costs generally. There's nothing explaining or quantifying what share of that is attributable to the class of aliens that the proclamation would like to suspend entry for. And at this stage of the litigation, it's simply that the government hasn't made the necessary showing, and the claims of harm that the government has made need to be balanced against the irreparable harm that the proclamation would inflict, not only on the named plaintiffs and the clients of Latino Network, but thousands of other similarly situated individuals who are threatened with- Well, that's a good segue to my question. In terms of the scope of the injunction, the government argues that if the preliminary injunction is to continue, that it ought to be limited to the named plaintiffs as opposed to a nationwide class. What's the justification for a nationwide class in the preliminary injunction? First, one justification is the harm that we have here. The harm is an unlawful proclamation that overrides congressionally legislated statutory provisions, and that harm cannot be remedied simply by prohibiting enforcement of the proclamation to the named plaintiffs. Why is that the case? That would be true in the context of any rule that has a national scope. That is true, but Judge Simon's opinion here is very closely tied to what the record is here. And we do think that the scope of injunction is supported by the record, which shows that in addition to that, the harm of this proclamation that overrides congressionally legislated statutes, that in doing so, the proclamation inflicts irreparable harm on thousands of similarly situated individuals who do face the same genuine irreparable harm as our plaintiffs. You have an APA claimant here as well, which goes to the State Department's quickly issued documents, I mean, guidances? Is that what it goes to? Yes, the APA claim goes to that notice, the notice of information collection, but also to the implementation of this proclamation. And as the city and county of San Francisco case noted, with regard to APA claims, the usual remedy is to vacate. That's correct. But here, if we vacated those implementations, we still have the proclamation left. So then what? As a practical matter, the proclamation does need to be implemented by agencies. It is implemented by the consular officers who are on the ground conducting consular interviews. And so I do think that that's why Judge Simon's injunction speaks to enjoining enforcement of the proclamation as to affected individuals. But under this Court's cases, what the question is, is do you need a nationwide injunction to remedy the plaintiff's harm? There's no class that's been certified. And so on what basis would the Court have needed to issue a nationwide injunction to protect the several individuals and then the organizational plaintiffs that are actually in this case right now? If you're asking what's the harm to our individual plaintiffs if someone else is denied a visa under the proclamation? That's one way to frame it. Or you could say, you know, why do you need a nationwide injunction if this had just been enjoined as to your clients and to the organizational plaintiff? Why wouldn't that have been sufficient relief for them? Well, first of all, it can't be the case that the proclamation is unlawful as to the named plaintiffs and the clients of Latino Network, but lawful as to every other individual who faces the same irreparable harm. And with respect to the scope of relief, we do have a putative class. We have a putative class, meaning that you alleged a class, but no class was certified. Even for purposes of the preliminary injunction. No class has been certified yet, but Judge Simon is moving forward with class certification. He is allowing the government to pursue class certification discovery, which they wish to do. He has set a briefing schedule to complete briefing on the class certification motion, and he said that he will take the class certification motion under advisement on March 9th, which is two months from today. As to the organizational plaintiff, what is its scope of operations? It is Multnomah County in Oregon. It serves clients in Multnomah County. Now, are all your clients, do all your clients have approved visas? No, none of them currently. They have approved petitions, but then they must, yes. They all have approved petitions. Yes, they have approved petitions, and then they need to go to the consular interview. But your proposed class includes not only people with approved petitions, but those who are pending and want to file, correct? Yes. So let me ask you this question. As to the nationwide scope of the injunction, how can you distinguish between the irreparable harm that would exist to those who have approved petitions and those who are just thinking about filing petitions? We think that the harm that the proclamation presents here is an unlawful obstacle to individuals who are seeking or would seek immigrant visas, and the effect – No, I understand it completely as to those with approved petitions, but the nationwide injunction extends beyond that to those who haven't even applied yet. So can you explain the irreparable harm to your clients that would flow from that? This, I think, touches on Judge Bress's question. And, yes, so our clients would not actually individually be harmed. So then give me the justification for a nationwide injunction that would extend beyond those who have an approved or pending petition. The harm that the proclamation presents to those people is an unlawful obstacle in their path to – But it has to do with irreparability and immediacy, right? I mean, it seems that there's a contingency built in with regard to people who have not – don't have approved petitions, which is they may not get approved petitions. So it isn't necessarily their obstacle. They may have other obstacles. That is true. But the proclamation – the injunction speaks to this particular obstacle. And also I'd point out that in the class certification process, Judge Simon said that he can and will revisit the scope of injunction and is proceeding apace with that. Well, what it actually says, the injunction, is defendants are enjoined from taking any action to implement or enforce presidential proclamations such and such. Well, I suppose that somebody who doesn't have an approved petition isn't going to apply for – isn't going to be in a consular office applying for a visa, so they're not going to – it's not going to affect them. That is true. So it really is limited to people who have an approved petition. Yes, that's correct. She might have said that. I'm not sure that that's quite right, but go ahead. You're over your time, but why don't you – Yes, I would simply reiterate that the government hasn't made the necessary showing for a stay here, and it's premature for the government to suggest that Judge Simon is not capable of tailoring the injunction on a going-forward basis as he addresses the plaintiff's class certification motion. And the government is free to offer evidence and argument as to why the scope of injunction should be tailored at that stage. But in the meantime – well, yes, and if the court does have reservations – But doesn't this seem to get it exactly the opposite? Why wouldn't this injunction be entered to protect the people who are currently before the court, then have the class certification proceedings, and then at that point revisit it there is no class. The class proceedings are ongoing. That can be a very lengthy process, and it's not remotely complete yet. And so why start big and then go small when it's not necessary to protect the people who are actually before the court at this time? Judge Simon found that this breadth of injunction was necessary to preserve the status quo, and I think that that is within the court's equitable powers. And he did consider an extensive record that shows that the harms extend far beyond the named plaintiffs, which is what this court has instructed the district court to do in Azar, East Bay 2, the city and county of San Francisco, to conduct a searching inquiry of the record and whether it shows that harm. Judge Simon has done that here, and the injunction does preserve the status quo and prevents a major and unprecedented change in the nation's immigration system from occurring, which balances the equities while the litigation moves forward. Thank you, counsel. Thank you. We'll put on four minutes for rebuttal. We'll give you the time you tried to reserve, and then our questions take you over. I appreciate that. I'll just raise a couple points. First, on the district court's scope of the district court's injunction, which is universal, not nationwide, this court has recently I don't understand that. Is there a difference between universal and nationwide? Well, it applies to consular officers abroad, including people who have no connection to the United States. So we would say it applies worldwide, I guess. If we limited the stay or the injunction as to the nameplates, what's the irreparable harm to the United States to these handful of people coming in who already have approved petitions? I mean, obviously, the harm is much more substantial, given that we have a nationwide injunction, and this court has recently sort of said that that's a concern. It requires this kind of My question is, if we limited it, what's the irreparable harm to the United States for these handful of people? Well, I mean, it would be the nationwide harm, but smaller. So the President, it would still have the institutional harms against the President effectuating the will of Congress. Well, wait a minute. It seems to me that you're, in this instance, if you said against the President effectuating his own will, it would be one thing. But this is the weakest possible situation for effectuating the will of Congress. I mean, the only will of Your argument is essentially that the will of Congress is he can do what he wants, but there's no other will of Congress. So unlike most I mean, in general, the notion that any time there is an impedance with a congressional enactment, that that's irreparable harm is, in my view, somewhat overdone. But here you're on the weakest possible ground for that. Well, we do think there's institutional harm. Congress entrusted the President to make these determinations. That's what Hawaii said. We're kind of getting back to the merits rather than to irreparable harm, but we would say that that is the kind of institutional harm. There would also be, obviously, harm related to the individual plaintiffs and members of the plaintiff organization. So let me expand that just a little bit. We're talking about here a stay of a preliminary injunction that's going to be scheduled to be heard on the merits in a few months. What's the irreparable harm, even if we expand it to the universal or nationwide, of what happens in the next two or three months? I mean, the applications will go forward. They'll be decided one way or the other. It's hard to argue that the nation's health care system is going to come crashing down in the next three months. The harm to the President's identified concerns is permanent because the only chance to effectuate this proclamation is at entry. So everyone who enters in that time will not be subject to the proclamation and will cause the harms that the President identified. And plaintiffs would say that's a lot of people. How many people is that in the next two or three months? Well, you know, plaintiffs have a number. I think, I mean, there's, you know, probably a couple thousand. No, I think, I mean, again, the OMB. I mean, we're talking about people who get approved, go through all the process. You know, they've got to get their visas for other reasons. I mean, that's a pretty limited number of people within this limited time scope. I'm not talking about permanently. I get your point on that. The institutional harm is much more extreme there. And the OMB notice, I believe, said these questions would be asked to around 400,000 immigrants, intending immigrants per year. So if you divide that up, you can see that there are significant numbers who would come in and cause the harms identified by the President. And I want to stress this court, especially in California v. Azar, indicated that nationwide injunctions when relief could be provided to the parties are not appropriate. And it cited three concerns, percolation among the courts. There's another case in SDNY that's challenging this same policy. Impact on non-parties. Again, there's been no class certification process here. And forum shopping, the risk of forum shopping. And what California v. Azar said is these concerns have especially apply when we have applied with special force when there's no class certified. And here there's been no class certified. The district court said in its opinion, I'm not even going to look at that. I don't have to look at that. I'm just going to issue a universal injunction. So we don't know if it's appropriate to certify a class. We have significant questions about it. The district court authorized us to take discovery because of concerns about the scope of the class, the class representatives, and the declarations we talked about before that are very conclusive. What about the Reasons v. DHS case, which seems to essentially say that immigration cases are special because of the need for uniformity and that a universal injunction, therefore, is particularly appropriate in that context? I think this court has said, has walked that back a little bit since that time. And I think in the San Francisco or East Bay cases, this court did not accept that kind of reasoning, that because it's an immigration case you always get a nationwide injunction. And we're seeing the stress on the courts that are caused by these injunctions. I'm not sure we'd be here today if the district court had— Well, there'd be more stress on the court if each of these individual people have to come in. I mean, presumably, if there is no universal injunction, then the next 20 more people can come in tomorrow to the same district court and ask to be included in the injunction. And then another 100 people can go into some other court and have the whole thing relitigated. And, you know, the Federal rules address that because they create class action procedures. They represent seven people in an organization right now. Until the court, the district court goes through the process and assesses the appropriateness of them representing everyone, they don't represent them. They talked about their clients being hurt, but their clients are the seven plaintiffs and the organization. And there are—those protections are really important. And they help avoid what we have here, which is if they win and get a nationwide relief, they don't really need to go through that process. If they lose, it doesn't bind any of the non-clients. So it is a distortion of the system, and it is something that, you know, the Supreme Court recently, this court, has expressed concerns about. And in this case, it's a very easy solution. If, you know, we have all our arguments on the merits and on why there shouldn't be an injunction, but even if there is, it's quite clear that an injunction addressing the seven plaintiffs and the organization, which has limited geographic scope, would fully remedy the plaintiff's harm. Are you counsel in the district court as well? Excuse me? Are you counsel in the district court as well? Yes. So can you tell me what the status of the district court proceedings are? The district court has recently issued a scheduling order, I think, at the very end of last year. There's going to be class discovery that goes on over the next few weeks, and I think we're renewing class certification papers by the end of January. Okay. So that's moving quickly. All right. I'm way past my time, so I — But you can make a — if you want to conclude, go ahead. Well, I just want to conclude. This is a, you know, Hawaii — it's very hard to separate this case from Hawaii, where the Supreme Court recognized the breadth of the President's authority and that he was entrusted to make these kind of determinations. This does not — the President's addressing people — new arrivals who lack health insurance is not the exact problem addressed by the public charge rule. An exact problem is the term used in the Hawaii case. It is a different problem. Well, it's used some places in the Hawaii opinion, not in others. Well, I mean, I think the Hawaii case was much tougher because there the court was talking about a provision of the INA that barred discrimination based on nationality, and the proclamation was nationality-based. So the court had to study whether there was — whether this proclamation expressly overrided a provision of the INA. When you're simply supplementing a ground of inadmissibility, Hawaii is much clearer. It says — 212F clearly does that. It's in the same provision of the INA. You have all the grounds of inadmissibility, and then you have 212F, which says the President can find additional grounds to bar entry. So we think this is readily permissible under Hawaii and encourage the court to stay the door. Thank you. Thank you, counsel. Thank all of you for your arguments today and your briefing. It's been very helpful to the court. And the case just argued will be submitted for decision.
judges: Thomas, Berzon, Bress